# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 30 2018, 9:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT-FATHER

Carlos I. Carrillo
Greenwood, Indiana

ATTORNEY FOR APPELLANT-MOTHER

Luisa M. White
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of G.E.G., Jr. (Minor Child), <br><br> G.E.G. (Father) and K.A.G. (Mother), <br><br> *Appellants-Respondents,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | January 30, 2018 <br><br> Court of Appeals Case No. 79A02-1708-JT-1972 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Tricia L. Thompson, Juvenile Magistrate <br><br> The Honorable Faith A. Graham, Judge <br><br> Trial Court Cause No. 79D03-1610-JT-102 |

**Najam, Judge.**

# Statement of the Case

G.E.G. ("Father") and K.A.G. ("Mother") appeal the trial court's termination of their parental rights over their minor son G.E.G., Jr. ("Child"). Father raises four issues for our review, and Mother raises three issues. We consolidate the parties' arguments into the following four issues on appeal:

1. Whether the trial court abused its discretion when it admitted certain evidence against Father.

2. Whether the trial court's conclusion that the conditions that resulted in Child's removal from Mother will not be remedied is clearly erroneous.

3. Whether the trial court's conclusion that the continuation of Father's relationship with Child poses a threat to Child's well-being is clearly erroneous.

4. Whether the trial court erred when it concluded that the termination of the parent-child relationships is in Child's best interests.

We affirm.

# Facts and Procedural History[1]

In 2014, the Indiana Department of Child Services ("DCS") petitioned the trial court to have Child, who was born in February of 2006, adjudicated a Child in Need of Services ("CHINS") on the basis of Mother's drug use and Child's absences from school. Child lived with both Mother and Father. The trial court granted DCS's petition, ordered Child to attend school, and ordered Mother and Father to refrain from drugs and alcohol and to submit to drug screens and all other services and recommendations. The court continued Child's placement with Mother and Father.

About one month later, in February of 2015, Mother tested positive for methamphetamine. Accordingly, the trial court ordered Mother "to be removed from the home" and for Child to remain at the home with Father. Ex. Vol. 1 at 24.[2] At that time, Father agreed that the removal of Mother from Child's home was in Child's best interests.

In January of 2016, DCS removed Child from Father's care. The next day, the trial court found the following facts and approved of DCS's removal of Child:

> [Child] was residing in the home with his Father on the condition that Mother vacate the residence and have absolutely no unsupervised contact with [Child] due to Mother's ongoing substance use and refusal to participate in services. DCS reports

---

[1] Neither Father's nor Mother's Statements of Facts in their respective briefs on appeal are in accordance with our standard of review, which is contrary to Indiana Appellate Rule 46(A)(6)(b).

[2] Our page references to the exhibits are to the .pdf paginations of the respective volumes.

that a report was received that officers from the Tippecanoe County Community Corrections and Tippecanoe County Drug Task Force were in the Father's home on January 3, 2016. Father consented to a search of the home and officers located two purses in the Father's bedroom. In one purse, officers located Mother's identification along with a clear glass smoking device identified by law enforcement as a methamphetamine pipe and a small plastic baggy with a white powdery substance that resembled methamphetamine. A second smoking device was located in the living room that had residue of burnt marijuana or spice. [Child's] adult sister was living in the family home and had been serving her house arrest sentence there. Mother was also at the residence while [Child] was there despite the restriction. The adult sister was arrested and the Mother was allowed to leave the residence.

*Id.* at 51. The court then ordered Child to be placed in foster care.

[6] While in foster care, Child's attendance, academic performance, and behavior at school improved. The semester prior to his placement in foster care, Child had 23 absences and 12 tardies; his grades were mostly Cs and Ds; he "was really tired," "often had his head down," and "did not want to work in the classroom"; and he had thirteen reports of "severe" behavioral issues. Tr. Vol. 2 at 23-26. However, immediately following his placement in foster care, Child "was at school every day, on time"; his grades improved to mostly As and Bs; he was "ready to work"; and he had a "substantial decline" in behavioral issues. *Id.* at 24, 27.

[7] During the CHINS proceedings, DCS recommended that Child participate in therapy. While in the care of Father or Mother, Child would not participate in

that therapy. However, upon his placement in foster care, Child participated in weekly therapy sessions with Kathleen Carmosin at Wabash Valley Alliance. Child was initially diagnosed[3] with oppositional defiance disorder stemming from his home environment and "inconsistent parenting." *Id.* at 78.

[8] During his therapy sessions, Child expressed "a lot of anxiety" with respect to Mother and Father, which resulted in "behavior issues in the school setting" and "with caregiver[s]." *Id.* at 76. With respect to Mother, Child was "fearful that she . . . is homeless . . . , that she's still using drugs, that she might be literally sitting on a street corner somewhere." *Id.* With respect to Father, Child "has a lot of distrust," especially in regards to Father's "inability to or struggle to say no to [Mother] or put up boundaries with [Mother]" and "Father's drinking." *Id.* at 72-74. Although Father participated in several of Child's therapy sessions, Carmosin opined that Father had made "[m]inimal to no[]" progress with Child and that Father was not in a position to reassume the role of Child's primary caregiver. *Id.* at 74-75. Mother did not participate in Child's therapy sessions.

[9] On October 27, 2016, DCS filed its petition to terminate Mother's and Father's parental rights over Child. During the ensuing evidentiary hearing, DCS submitted the records of the CHINS proceedings, which included an April 17, 2015, order that prohibited Mother from visiting Child until she "maintain[ed]

---

[3] It is not clear from the record who at Wabash Valley Alliance diagnosed Child.

thirty (30) days of clean drug screens." Ex. Vol. 1 at 32. Mother repeatedly failed her drug tests, and her visits with Child never resumed. Mother also did not do "[a]nything" with respect to DCS's recommended services, which included services to help Mother with her substance abuse. Tr. Vol. 2 at 165. Mother's last "direct interaction" with Child was prior to his January 2016 removal. *Id.* at 139. During the termination hearing, Mother testified that she did not "have an address" but, instead, "stay[ed] with a friend here and . . . there." *Id.* at 214. She also agreed that she is not currently employed and that she is not "in a position that [she] could provide for [Child's] basic needs . . . ." *Id.*

[10] With respect to Father, DCS submitted the CHINS records to show that Child had been removed from Father's care in January of 2016 after Father had permitted Mother to be in the home with Child, contrary to Father's initial acknowledgment to the CHINS court that it was not in Child's best interests to do so. The CHINS records also demonstrated that, in February of 2016, "[Father] continue[d] to deny any problem with [Mother] being in the home— his statements around this are inconsistent, as he'll sometimes say that he was aware . . . but then will deny any knowledge." Ex. Vol. 1 at 157. Further, nearly a year after Child's removal from Father's care, in December of 2016, an officer with the Lafayette Police Department went to Father's home to serve an arrest warrant on a third party, and Mother answered the door. The officer subsequently observed paraphernalia and smelled the odor of freshly burnt synthetic marijuana inside the home.

[11] DCS also presented evidence of Father's history of alcohol use, which included three convictions for operating while intoxicated and a substantial number of failed or missed alcohol screens between July 29, 2016, and November 4, 2016. At the termination hearing, Father acknowledged that he has a problem with alcohol. However, Father's therapist, Dr. Cathy Streifel, testified that, even though "the more commitment the individual has the more they're going to benefit" from various types of treatment, Father "didn't really think he needed" additional help with his problem. Tr. Vol. 3 at 63-64, 70.

[12] Finally, Child's court-appointed special advocate, Kalub Hahne ("CASA Hahne") testified that the termination of Mother's and Father's parental rights was in Child's best interests. In particular, CASA Hahne testified that he was concerned about Mother's continued drug use, Father's continued drinking, and Child's safety if left in Father's care unsupervised. CASA Hahne further testified that Child is "thriving" in foster care, especially with respect to his school work and behavior. *Id.* at 141-43.

[13] On August 3, 2017, the trial court entered findings of fact and conclusions thereon and terminated Mother's and Father's parental rights over the Child. This appeal ensued.

## Discussion and Decision

[14] We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe*

*Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[15] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> >
> > (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> >
> > (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child

being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2017). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[16] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial

court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[17] Here, in terminating Mother's and Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[18] On appeal, we first consider an evidentiary issue raised by Father. We then turn to Mother's assertion that the trial court erred when it concluded that the conditions that resulted in Child's removal and the reasons for his placement outside of Mother's care will not be remedied.[4] Third, we separately consider Father's argument that the trial court erred when it concluded that there is a reasonable probability that the continuation of the Father's relationship with

---

[4] Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address the trial court's alternative conclusions supporting its termination of Mother's and Father's parental rights over Child.

Child poses a threat to Child's well-being. Last, we consider Mother's and Father's arguments that the trial court erred when it concluded that the termination of their parental rights is in Child's best interest.

### *Issue One: Admission of Father's Alcohol Screens*

We first consider Father's argument that the trial court abused its discretion when it admitted into evidence a positive alcohol screen against him. The trial court has broad discretion to rule on the admissibility of evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014). We review its rulings for an abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id.*

According to Father, DCS sought to admit "only some" of Father's alcohol screens," namely, "only . . . select recent screens of Father that were positive for alcohol." Father's Br. at 37. Father asserts that this "painted an inaccurate picture regarding Father's alcohol abuse" as it omitted "numerous other screens that were negative for drugs/alcohol." *Id.* Father continues that this inaccurate picture was error under Indiana Evidence Rule 106, which states that, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."

In overruling Father's objection on this issue, the trial court informed Father that he could "admit the other screens" during his presentation of the evidence "or you can ask about that question" on cross-examination. Tr. Vol. 2 at 163. Father makes no argument on appeal as to how the trial court abused its discretion under Evidence Rule 106 when it informed Father that he could submit the negative alcohol screens himself or otherwise satisfy his concerns through cross-examination. Moreover, Father does not discuss the fact that the record demonstrates that at least some of his negative alcohol screens were in the record and before the trial court. *See* Ex. Vol. 3 at 180-242. In short, Father has not met his burden on appeal to demonstrate error, let alone reversible error, on this issue.

### Issue Two: The Conditions that Resulted in Child's Removal from Mother will not be Remedied

We next consider Mother's argument that the trial court erred when it concluded that the conditions that resulted in Child's removal from her will not be remedied. In determining whether the evidence supports the trial court's finding that Mother is unlikely to remedy the reasons for Child's removal, we engage in a two-step analysis. *E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotations and citations omitted). In the second step, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration

evidence of changed conditions. *Id.* However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[23] Mother's argument on this issue challenges only the factual findings underlying the trial court's judgment. According to Mother, the trial court erred: when it found that Mother had failed to complete an August 2015 assessment; when it found that Mother did not participate in services during a time of incarceration for contempt of court, which the court had ordered her to serve for not participating in services; when it found that Mother had failed to participate in inpatient treatment; and when it found that Mother had failed to submit to all drug screens requested.

[24] Assuming for the sake of argument that the trial court erred in each of those findings, we still cannot say that the trial court's conclusion that the conditions that resulted in Child's removal from Mother will not be remedied is clearly erroneous. The record is clear that Child was removed from Mother's care because of her drug use and his repeated school absences. Throughout the

ensuing proceedings, Mother continued to use drugs and fail drug screens and only had minimal involvement in Child's life. She repeatedly failed to fully participate in or complete recommended services. And, at the evidentiary hearing on DCS's termination petition, she conceded that she is unemployed, living "here and . . . there" with friends, and unable to provide for Child's basic needs. Tr. Vol. 2 at 214. The trial court's conclusion that the conditions that resulted in Child's removal from Mother will not be remedied is not clearly erroneous.

### Issue Three: Continuation of the Father-Child Relationship Poses a Threat to Child's Well-Being

[25] We thus turn to Father's argument that the trial court erred when it concluded that the continuation of Father's relationship with Child poses a threat to Child's well-being. A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Shupperd v. Miami Cty. Div. of Fam. & Child. (In re E.S.)*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. *Id.*

[26] Father asserts that he is not a threat to Child's well-being. In particular, Father shifts blame to DCS for its purported "delay [in] providing him with adequate services and treatment" for his alcohol problem, Father's Br. at 33; he asserts that his therapy sessions were aimed not at alcohol abuse but at his relationship

with Mother; he states that he was compliant with and completed various services; and he asserts that his relationship with Child was improving. Father also states that he "was more effective at disciplining Child than the foster parents" and that, "despite the suggestion that . . . Child's aggressive behavior was improved after being placed with foster parents, . . . Child's behavior was mostly unchanged throughout the CHINS case." *Id.* at 35. But Father's arguments on appeal merely seek to have this Court reweigh the evidence, which we cannot do.

[27] The evidence most favorable to the trial court's judgment demonstrates that the trial court did not err when it concluded that the continuation of Father's relationship to Child posed a threat to Child's well-being. Following Mother's February 2015 failed drug screen, the trial court ordered Mother to be removed from the home. At that time, Father agreed that removal of Mother from Child's home was in Child's best interests. Nonetheless, in January of 2016, Mother was found inside the home along with contraband. In February of 2016, after the court had also removed Child from Father's care, Father "continue[d] to deny any problem with [Mother] being in the home . . . ." Ex. Vol. 1 at 157. In December of 2016—nearly a year after Child's removal from Father's care and during the pendency of the termination proceedings—Mother was again found inside Father's home, along with evidence of recent drug use. Moreover, the evidence readily demonstrates that Father has an alcohol problem and that he continues to struggle with that problem.

Carmosin, Child's therapist, testified that Child does not trust Father because of Father's "inability to or struggle to say no to [Mother] or put up boundaries with [Mother]" and also due to "Father's drinking." Tr. Vol. 2 at 72-74. Carmosin further testified that Child's relationship with Father causes Child "a lot of anxiety," which adversely manifests itself in Child's behavior and performance at school. *Id.* at 76. In sum, the evidence shows that Child's emotional and physical development is threatened by Child's relationship with Father. As such, we cannot say that the trial court clearly erred on this issue.

### Issue Four: Child's Best Interests

Finally, we turn to Mother's and Father's arguments that the termination of their parental rights over Child is not in Child's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't. of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "[W]e have previously held that the recommendation by both the case manager and child advocate to terminate parental rights," in addition to evidence supporting a termination order under Indiana Code Section 31-35-2-4(b)(2)(B)(i) or (ii), is "sufficient to show by clear and convincing evidence that termination is in the child's best interests." *L.S. v. Ind. Dep't of Child Servs. (In re A.D.S.)*, 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013), *trans. denied*.

On this issue, Mother asserts that the DCS's evidence "settled on the assumption that . . . [C]hild was better off with the Foster Parents," and that, "[w]hen taking into consideration Mother['s] and Father's

circumstances, . . . DCS did not prove by clear and convincing evidence that it was in the best interest[s] of . . . [C]hild for the parent-child relationship to be terminated." Mother's Br. at 17-18. Similarly, Father asserts that the totality of the evidence "indicated that Father took significant positive steps to turn his life around for the sake of himself and . . . Child." Father's Br. at 18. However, Mother's and Father's arguments, again, simply seek to have this Court reweigh the evidence in a manner that is most favorable to them, which we cannot do.

[31] Instead, considering only the evidence most favorable to the trial court's judgment, we must conclude that the trial court did not clearly err when it concluded that the termination of Mother's and Father's parental rights over Child was in Child's best interests. In addition to the evidence described above with respect to Issue Two and Issue Three, CASA Hahne testified that termination of Mother's and Father's parental rights was in Child's best interests based on Mother's continued drug use, Father's continued drinking, Child's safety if left in Father's care unsupervised, and Child's "thriving" in foster care, especially with respect to his school work and behavior. Tr. Vol. 3 at 141-43. Child's case manager, Maci Webster, likewise recommended the termination of Mother's and Father's parental rights. Tr. Vol. 2 at 112. Accordingly, we cannot say that the trial court's conclusion on this issue is clearly erroneous.

## Conclusion

[32] In sum, we affirm the trial court's termination of Mother's and Father's parental rights over Child.

[33]     Affirmed.

Mathias, J., and Barnes, J., concur.